

tsef FILED

NOV 08 2013

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

In re                                    )    Case No. 11-17873-B-13
                                         )
Kevin James Maxwell and                  )    DC No. RSW-3
Tonia Noel Maxwell,                      )
                                         )
            Debtors.                     )
_____)

## MEMORANDUM DECISION REGARDING MOTION TO CONFIRM FIRST MODIFIED CHAPTER 13 PLAN

Robert S. Williams, Esq., appeared on behalf of the debtors, Kevin James Maxwell and Tonia Noel Maxwell.

Kristen M. Gates, Esq., appeared for the chapter 13 trustee, Michael H. Meyer, Esq.

Before the court is a motion by the debtors, Kevin and Tonia Maxwell (the "Debtors") who seek to modify their confirmed chapter 13 plan (the "Motion"). The chapter 13 trustee, Michael H. Meyer, Esq. (the "Trustee") objects to the Debtors' first modified chapter 13 plan (the "Plan"). He contends that the Plan does not satisfy the "good faith" requirement of 11 U.S.C. § 1325(a)(3)[1] (the "Objection"). This contested matter was argued before the court on October 2, 2013, and taken under submission after both sides filed supplemental briefs. For the reasons set forth below, the Trustee's Objection will be sustained and the Debtors' Motion will be denied.

---

[1]Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036, as enacted and promulgated *after* October 17, 2005, the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) of 2005, Pub. L. No. 109-8, 119 Stat. 23.

1   This memorandum decision contains the court's findings of fact and conclusions
2   of law required by Federal Rule of Civil Procedure 52(a), made applicable to this
3   contested matter by Federal Rules of Bankruptcy Procedure 9014(c) and 7052. The court
4   has jurisdiction over this matter under 28 U.S.C. § 1334, 11 U.S.C. §§ 1325 and 1329 and
5   General Orders 182 and 330 of the U.S. District Court for the Eastern District of
6   California. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).
7   **Background and Findings of Fact.**

8   **The Modified Plan.** The Debtors filed a petition for relief under chapter 13 in
9   July 2011. Their initial chapter 13 plan was confirmed in October 2011. The Debtors
10  have one dependent child, age 19, and their income is above the applicable median for a
11  family of three. Their disposable income was therefore determined by application of the
12  Means Test (Form B22C). The Debtors' initial plan required a monthly payment to the
13  Trustee in the amount of $4,762.38 for a term of 60 months. It provided nothing (0%) to
14  general unsecured creditors, all of the plan payments being devoted to priority and
15  secured claims and to administrative expenses. The initial plan provided for the curing of
16  arrearages and maintenance of post-petition mortgage payments on two residential real
17  properties. One of those properties is the Debtors' residence. The monthly contract
18  installment for the residence mortgage was stated in the initial plan to be $2,618.68. The
19  arrearage to be cured through the plan was stated to be $31,341.64, which was to be cured
20  with a monthly payment of $652.95.[2] The total monthly payment the Trustee was making
21  on account of the residence mortgage was approximately $3,271.63.

22  Sometime in mid-2013, the Debtors negotiated a modification of their residence
23  mortgage which restructured the debt and cured the arrearage. On November 6, 2013, the
24  court entered an order, approved by the Trustee, authorizing the Debtors to modify their
25  residence mortgage. The application for that order was submitted ex parte and states that

26
27
28

---

[2]CitiMortgage, Inc., filed a timely proof of claim for the residence mortgage showing a
balance due of $425,906.30 with an arrearage of $35,724.70

2

1   the monthly mortgage payment will decrease by more than $1,000 in the modified

2   mortgage to $1,559.71. In addition, the mortgage modification eliminates the need for

3   the arrearage payment reducing the debt service burden by an additional $652.95 per

4   month. Altogether, the mortgage modification results in a monthly cash flow savings of

5   $1,711.92 (current mortgage service $3,271.63 - new mortgage payment $1,559.71).

6   On June 13, 2013, the Debtors filed the proposed modified Plan which is now

7   before the court. In the Plan, the mortgage payments on both of their real properties will

8   now be paid directed by the Debtors, in Class 4. The monthly payment to the Trustee will

9   decrease to $500 beginning in June 2013, and the unsecured creditors will receive an

10  "unknown" dividend on their unsecured claims.[3] In support of this Motion, the Debtors

11  explain that their household and living expenses have increased by $1,996.64[4] which

12  exceeds the savings realized by the mortgage modification. The Motion pleads that the

13  Plan has been proposed in good faith.

14  **Trustee's Objection.** The Trustee objects on the grounds that the Plan is not

15  proposed in good faith. The argument focuses on the fact that the Debtors are committing

16  essentially nothing to the unsecured creditors even though their combined average

17  monthly income has increased and their monthly mortgage expense has decreased

18  significantly. At the time the Objection was filed, the Debtors had not yet provided

19

20  _____

21  [3]The monthly dividend on account of the Class 2 automobile loan will be $475 so the new
    Plan payment does not appear to cover the Class 2 debt service and the corresponding Trustee's

22  fee. The Plan payment will increase to $709.39 in October 2015, after the Debtors pay off a loan
    from their retirement account, but it is not clear how much, if any, of the additional money will

23  be distributed to the unsecured creditors. The Plan lists priority tax claims totaling $5,903, but no

24  proofs of claim were filed for the priority debts.

25  [4]The increase in living expenses is broken down as follows:

26          heating expense + $400, home maintenance + $400, additional food + $650,
            monthly clothing + $100, laundry and dry cleaning + $100, transportation

27          + $100, insurance + $37.25, and repayment of a retirement loan $209.39 (to

28          terminate in September 2015.

3

1  amended schedules, or supporting documentation to illustrate their current financial

2  situation.[5]  The Motion was originally set for hearing on July 31, 2013.  At the request of

3  Debtors' counsel, it was continued to August 28th to give Debtors an opportunity to

4  provide supporting expense documents to the Trustee.  The court also requested from the

5  Trustee a statement of unresolved issues in advance of the continued hearing.

6      Prior to the continued hearing, the Trustee filed a status report based on his review

7  of documents provided by the Debtors.  The Trustee acknowledged that the Debtors'

8  actual utility bills for the months of May and June 2013 were $803.46 and $975.25,

9  respectively.  The Trustee contends, *inter alia*, that the food expense, which more than

10  doubled on amended schedule J, in the average amount of $1,200 per month ($400 per

11  person), is not reasonable and necessary.  The Debtors' food expense is now almost twice

12  the national standard for a family of three.[6]  The Trustee also questions the reasonableness

13  and necessity of a mini-storage expense in the amount of $93 per month.  At the

14  conclusion of the hearing, the court offered the parties an opportunity to submit

15  supplemental briefing on the "good faith" issue raised by the Trustee.  Both the Trustee

16  and the Debtors filed supplemental briefs.

17      **Issues Presented.**  This "powder keg" was ignited by the fact that the Debtors

18  have, since confirmation of their initial plan, enjoyed a significant increase in monthly

19

20  ───────────

21  [5]Prior to the initial hearing, the Debtors did file amended schedules I and J.  The amended
   schedules disclose an increase in "combined average monthly income" from $7,751.49 to

22  $8,499.10, an increase of $747.61.  They also reflect the lower mortgage payment on their
   residence and many of the increased living expenses referred to in the Debtors' Motion.  After

23  allowing for the increased income and offsetting expenses, amended schedule J states that the
   Debtors have a monthly net income of $490.47. The Debtors again amended schedules I and J

24  after the continued hearing, on November 4, 2013.  The amended schedules show a monthly net

25  income of $500.04.

26  [6]The Debtors' expense records were not filed with the court.  At the hearing, the Debtors'

27  counsel acknowledged that some of the records provided to document the "food" expense
   included the purchase of non-food items, such as pots and pans.  The Trustee also notes that the

28  Debtors are "eating out all the time." Hr'g Tr. 6:19, Oct. 2, 2013.

4

1  income and substantially reduced their monthly mortgage expense, but have
2  correspondingly increased their monthly living expenses to more than compensate for the
3  savings.  The Trustee contends, based on the "totality of the circumstances" that the
4  Debtors' failure, or refusal, to commit at least some of the saved money to their unsecured
5  creditors constitutes a lack of the "good faith" which they must show to modify a
6  confirmed plan. § 1325(a)(3) made applicable here by § 1329(b)(1).

7      In response, the Debtors take issue with the good faith objection because the
8  modified plan does not decrease the 0% distribution offered to the creditors in the original
9  confirmed plan.  The Debtors question whether it is appropriate for the Trustee to raise
10 the "good faith" objection and seek an increase in the distribution to unsecured creditors
11 when the only modification proposed in the Plan is to accommodate the modified
12 mortgage.  They contend that the "good faith" test has been satisfied because their
13 increased living expenses are "reasonable and necessary" and request an evidentiary
14 hearing to prove the point.  The Trustee does not contend that the amended schedules do
15 not reflect the Debtors actual living expenses.  For purposes of this Memorandum the
16 court will assume, without finding, that the expenses stated in amended schedule J reflect
17 the actual living expenses.

18 **Analysis and Conclusions of Law.**

19     When the Debtors confirmed their initial chapter 13 plan, the distribution to
20 unsecured creditors was a function of the debtor's "projected disposable income."
21 § 1325(b)(1)(B).  The term "projected disposable income" is a number that is calculated
22 through the Means Test based on the debtor's income and various allowed deductions.
23 The Means Test determines, *inter alia*, which statutes will govern the calculation of
24 "disposable income," how much the debtors must pay to their unsecured creditors, and
25 how long the debtors' chapter 13 plan must provide for those payments.

26     The Means Test was created as part of BAPCPA, which Congress enacted "to
27 correct perceived abuses of the bankruptcy system" and to "help ensure that debtors who
28 *can* pay creditors *do* pay them."  *Ransom v. FIA Card Services, N.A. (In re Ransom)*, 131

5

S.Ct 716, 721 (2011) (emphasis in original, citations omitted). The deductions allowed on the Means Test are governed by statute and the Internal Revenue Service guidelines and the court has limited discretion to vary those deductions. The Means Test was designed by Congress "to measure debtors' disposable income and, in that way, 'to ensure that [they] repay creditors the maximum they can afford.'" *Id.* at 725.

The Bankruptcy Code gives the court some discretion to allow an additional "special circumstance" expense when there is a true need for the expense due to circumstances which are clearly beyond the debtor's control and for which there is no reasonable alternative. Cases in which the courts have allowed the deduction of extra expenses usually involve extraordinary situations, "which not only put a strain on a debtor's household budget, but they arise from circumstances normally beyond the debtor's control." *Egebjerg v. United States Trustee (In re Egebjerg)*, 574 F.3d 1045, 1053 (9th Cir. 2009) (citation omitted).

The Debtors long ago confirmed a chapter 13 plan, without objection from the Trustee, which presumably satisfied the "disposable income" test as governed by § 1325(b)(1)(B). The Debtors now seek to modify that plan. Pursuant to § 1329(b), the "projected disposable income" test of § 1325(b)(1)(B) is no longer an absolute requirement. *See Sunahara v. Burchard (In re Sunahara)*, 326 B.R. 768, 781 (9th Cir. BAP 2005). However, it is fundamental that modification of a confirmed chapter 13 plan must be sought in "good faith." § 1325(a)(3). The Debtors have the burden of proof here. Good faith must be determined based on the totality of the circumstances and the "total circumstances" analysis includes "important components of the disposable income test . . . ." *Id.* In other words, once a chapter 13 plan is confirmed, the question of "disposable income" merges into the "good faith" analysis which "necessarily requires an assessment of a debtor's overall financial condition including, without limitation, the debtor's current disposable income . . . ." *Id.* at 781-82.

One of the "good faith circumstances" which the court must consider here is the mandate that debtors who can pay their creditors should pay their creditors. *In re*

6

1  *Ransom*, 131 S. Ct. at 721.  True, the Supreme Court's often quoted statement in *Ransom*

2  was made in reference to the chapter 13 means test, which is not literally applicable here,

3  however there is no reason why the policy issues in favor of paying creditors should

4  evaporate once the initial plan is confirmed, and it is not inappropriate for the Trustee to

5  raise the issue here.  Indeed, the Trustee has stated his intention to move for a hostile plan

6  modification to increase the plan payment if the court grants the Debtors' Motion.  Such

7  "hostile" action is authorized under the Bankruptcy Code and may be appropriate when a

8  debtor's financial situation substantially improves:

9           Thus, part of the statutory bargain inherent in chapter 13 is that the
            debtors must, for the prescribed life of the plan, run the gauntlet of
10          exposure to trustee or creditor requests to increase payments.
            BAPCPA, by creating a debtor's duty to make information available
11          to those who could propose modifications, actually reinforced this
            aspect of the statutory bargain.

12

13  *Fridley v. Forsythe (In re Fridley)*, 380 B.R. 538, 544 (9th Cir. BAP 2007).

14         Here, the Debtors' initial plan was confirmed based on a "projected disposable

15  income" as determined in the Means Test.  Now that the Debtors are trying to modify

16  their confirmed plan, they want to jettison the Means Test deductions completely and

17  move forward with a Plan payment based on their actual living expenses.  The Debtors

18  request an opportunity for an evidentiary hearing to prove that their actual living expenses

19  are "reasonable and necessary"; however, it is undisputed that the current actual living

20  expenses greatly exceed the statutory expenses allowed for confirmation of the initial

21  plan.  With the enactment of BAPCPA, Congress clearly intended that debtors who seek

22  bankruptcy relief, and whose lifestyle may interfere with the ability to fully pay their

23  creditors, must be prepared to make some adjustments to their lifestyle in a good faith

24  effort to repay the creditors as much as they can afford.  This duty continues so long as a

25  debtor enjoys the protection of chapter 13.

26         The Debtors have enjoyed a substantial increase in their monthly income, which

27  arguably compensates for a reasonable increase in their cost of living, the Trustee's

28  Objection is not based on the increased income.  They have also negotiated a modification

7

of their mortgage which will, hopefully, improve the ability to keep their home. The combined monthly benefit from these two events is more than $2,400. Yet, the Debtors are not willing to share any of this benefit with their unsecured creditors, and are essentially asking the creditors to fund the cost of their comfortable lifestyle, a lifestyle they weren't allowed under the Means Test. The record is devoid of any evidence to suggest that the Debtors, who are no longer constrained by the statutory Means Test, have made any adjustments to their lifestyle in an effort to pay the unsecured creditors as much as they reasonably can. There is no showing upon which the court can even infer that the increased monthly living expenses are due to circumstances beyond their control.[7] Absent such a showing, the court cannot find that the modified Plan is proposed in good faith.

**Conclusion.**

Based on the foregoing, the Trustee's Objection will be sustained. The Debtors' Motion to modify the confirmed chapter 13 plan will be denied, subject to the parties' ability to negotiate a compromise within 14 days.

Dated:  November ___*8*___, 2013

W. Richard Lee
United States Bankruptcy Judge

---

[7]The Debtors increased their average home maintenance and utility expense by $800 per month based on the need for roof repairs and electricity bills for two of the hottest months of the year. There is no evidence to show what roof repairs are required or what they might cost. The court accepts the fact that hot weather in the summer months and the need for roof repairs may constitute an unusual circumstance, but they are essentially short term problems and cannot be used as a basis for determining average expenses over the remaining life of the Plan. At the same time, the Debtors attribute the entire increase in food expense, $650 per month, to the eating habits of their teenage son. They offer no supporting evidence to show what, where and how much food their son actually consumes.

1

2

3 ## Instructions to Clerk of Court
### Service List - Not Part of Order/Judgment

4

5        The Clerk of Court is instructed to send the Order/Judgment or other court
generated document transmitted herewith to the parties below.  The Clerk of Court will

6 send the Order via the BNC or, if checked _____, via the U.S. mail.

7        Debtor(s), Attorney for the Debtor(s), Bankruptcy Trustee (if appointed in the
case), and __X__ Other Persons Specified Below:

8

9 Kristen M. Gates, Esq.
Attorney at Law

10 P.O. Box 28950
Fresno, CA 93729-8950

11

12 Office of the U.S. Trustee
U.S. Courthouse

13 2500 Tulare Street, Suite 1401
Fresno, CA 93721

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28